# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **SHAUN ALAN CLICKNER,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  5:18-cv-01497-MHH** |
| | } | |
| **ANDREW SAUL,** | } | |
| **Commissioner of the** | } | |
| **Social Security Administration,[1]** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

Pursuant to 42 U.S.C. § 405(g), plaintiff Shaun Alan Clickner seeks judicial review of a final adverse decision of the Commissioner of Social Security.  The Commissioner denied Mr. Clickner's claim for disability insurance benefits.  For the reasons stated below, the Court affirms the Commissioner's decision because substantial evidence supports the decision.

---

[1] The Court asks the Clerk to please substitute Andrew Saul for Nancy A. Berryhill as the proper defendant pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.  *See* Fed. R. Civ. P. 25(d) (When a public officer ceases holding office, that "officer's successor is automatically substituted as a party."); *see also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

## I.    PROCEDURAL HISTORY

Mr. Clickner applied for disability insurance benefits.  (Doc. 5-4, p. 2).  He alleges that his disability began on August 25, 2012.  (Doc. 5-4, p. 2).  The Commissioner initially denied Mr. Clickner's claim.  (Doc. 5-4, p. 2).  Mr. Clickner requested a hearing before an Administrative Law Judge (ALJ).  (Doc. 5-5, p. 12). The ALJ issued an unfavorable decision.  (Doc. 5-3, pp. 11-23).  The Appeals Council declined Mr. Clickner's request for review, making the Commissioner's decision final for this Court's review.  (Doc. 5-3, p. 2).  *See* 42 U.S.C. § 405(g).

## II.    STANDARD OF REVIEW

The scope of review in this matter is limited.  "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," a district court "review[s] the ALJ's 'factual findings with deference' and [his] 'legal conclusions with close scrutiny.'"  *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001)).

The Court must determine whether there is substantial evidence in the record to support the ALJ's factual findings.  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).  In evaluating the administrative record, a district court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ.

*Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted).  If substantial evidence supports the ALJ's factual findings, then a district court "must affirm even if the evidence preponderates against the Commissioner's findings."  *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, the Court must determine whether the ALJ applied the correct legal standards.  If a district court finds an error in the ALJ's application of the law, or if the court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then a district court must reverse the ALJ's decision.  *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## III.   SUMMARY OF THE ALJ'S DECISION

To determine whether a claimant has proven that he is disabled, an ALJ follows a five-step sequential evaluation process.  The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel*, 631 F.3d at 1178.

The ALJ determined that Mr. Clickner met the Social Security Act's insured status requirements through December 31, 2017, and that Mr. Clickner had not engaged in substantial gainful activity since the alleged onset date of August 25, 2012. (Doc. 5-3, p. 13). The ALJ determined that Mr. Clickner was suffering from the following severe impairments: post L4-L5 and S1, posterolateral fusion with interbody bone fusion at L5, S1 and open reduction and internal fixation of grade 2 spondylolisthesis. (Doc. 5-3, p. 13). The ALJ found that Mr. Clickner's conditions "not specifically mentioned in this decision, but . . . mentioned briefly in the record" were non-severe. (Doc. 5-3, p. 14) (emphasis omitted). Based on a review of the medical evidence, the ALJ concluded that Mr. Clickner did not have an impairment or combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Doc. 5-3, p. 13).

Given Mr. Clickner's severe impairments, the ALJ evaluated Mr. Clickner's residual functional capacity. The ALJ determined that Mr. Clickner has the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) with restrictions. (Doc. 5-3, p. 14).

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities. If someone can do light work, . . . [normally] he or

she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 416.967(b). The ALJ limited Mr. Clickner to lifting or carrying 20 pounds occasionally and ten pounds frequently. (Doc. 5-3, p. 14). In an eight-hour day, the ALJ restricted Mr. Clickner to six hours of sitting, standing, and walking. (Doc. 5-3, p. 14). The ALJ precluded Mr. Clickner from using ladders, ropes and scaffolds, working on uneven and vibrating surfaces or in extreme cold, and crawling. (Doc. 5-3, p. 14). The ALJ limited Mr. Clickner to occasional pushing and pulling of foot controls with his right lower extremity. (Doc. 5-3, p. 14). The ALJ restricted Mr. Clickner from climbing, balancing, crouching, bending, stooping, and kneeling beyond occasionally. (Doc. 5-3, p. 14).

Based on this RFC, the ALJ concluded that Mr. Clickner could not perform his past relevant work as a car mechanic. (Doc. 5-3, p. 22). Relying on testimony from a vocational expert, the ALJ found that jobs exist in the national economy that Mr. Clickner can perform, including inspector, product marker, and assembler. (Doc. 5-3, p. 23). Accordingly, the ALJ determined that Mr. Clickner was not under a disability within the meaning of the Social Security Act. (Doc. 5-3, p. 23).

## IV.   ANALYSIS

The ALJ found that Mr. Clickner's medical records, daily activities, and periodic activities—including lifting part of a car transmission and travelling to the

beach for vacation—do not support Mr. Clickner's testimony regarding his pain and limitations.  (Doc. 5-3, pp. 21-22; Doc. 5-3, p. 20).  In addition, the ALJ did not treat the evidence of Mr. Clickner's torn labrum as a severe impairment.  Mr. Clickner challenges these aspects of the ALJ's decision.  The Court considers these issues in turn.

A.     Mr. Clickner's Pain Evidence.

1.     Pain Standard

The Eleventh Circuit pain standard "applies when a disability claimant attempts to establish disability through his own testimony of pain or other subjective symptoms."  *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991); *Coley v. Comm'r, Soc. Sec. Admin.*, 771 Fed. Appx. 913, 917 (11th Cir. 2019).  When relying on subjective symptoms to establish disability, "the claimant must satisfy two parts of a three-part test showing:  (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged [symptoms]; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed [symptoms]."  *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing *Holt*, 921 F.2d at 1223); *Chatham v. Comm'r, Soc. Sec. Admin.*, 764 Fed. Appx. 864, 868 (11th Cir. 2019) (citing *Wilson*).  If the ALJ does not properly apply the three-part standard, reversal is appropriate.  *McLain v. Comm'r, Soc. Sec. Admin.*, 676 Fed. Appx. 935, 937 (11th Cir. 2017) (citing *Holt*).

A claimant's credible testimony coupled with medical evidence of an impairing condition "is itself sufficient to support a finding of disability." *Holt*, 921 F.2d at 1223; *see Gombash v. Comm'r, Soc. Sec. Admin.*, 566 Fed. Appx. 857, 859 (11th Cir. 2014) ("A claimant may establish that he has a disability 'through his own testimony of pain or other subjective symptoms.'") (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005)). If an ALJ rejects a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so." *Wilson,* 284 F.3d at 1225; *Coley*, 771 Fed. Appx. at 918. As a matter of law, the Secretary must accept the claimant's testimony if the ALJ inadequately or improperly discredits the claimant's testimony. *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988); *Kalishek v. Comm'r, Soc. Sec. Admin.*, 470 Fed. Appx. 868, 871 (11th Cir. 2012) (citing *Cannon*); *see Hale v. Bowen*, 831 F.2d 1007, 1012 (11th Cir. 1987) ("It is established in this circuit if the Secretary fails to articulate reasons for refusing to credit a claimant's subjective pain testimony, then the Secretary, as a matter of law, has accepted that testimony as true.").

When credibility is at issue, the provisions of Social Security Regulation 16-3p apply. SSR 16-3p provides:

> [W]e recognize that some individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence, and the same non-medical evidence. In considering the intensity, persistence, and limiting effects of an individual's symptoms, we examine the entire case record, including

the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record.

SSR 16-3p, 2016 WL 1119029, at *4. An ALJ must explain the basis for findings relating to a claimant's description of symptoms:

[I]t is not sufficient . . . to make a single, conclusory statement that "the individual's statements about his or her symptoms have been considered" or that "the statements about the individual's symptoms are (or are not) supported or consistent." It is also not enough . . . simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.

SSR 16-3p, 2016 WL 1119029, at *10. In evaluating a claimant's reported symptoms, an ALJ must consider:

(i) [the claimant's] daily activities; (ii) [t]he location, duration, frequency, and intensity of [the claimant's] pain or other symptoms; (iii) [p]recipitating and aggravating factors; (iv) [t]he type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate . . . pain or other symptoms; (v) [t]reatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of . . . pain or other symptoms; (vi) [a]ny measures [the claimant] use[s] or ha[s] used to relieve . . . pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (vii) [o]ther factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *Leiter v. Comm'r, Soc. Sec. Admin.*, 377 Fed. Appx. 944, 947 (11th Cir. 2010).

Accordingly, the Court examines Mr. Clickner's testimony and then compares his testimony to the medical and other evidence in the record.

### 2. Mr. Clickner's Testimony

During his November 2017 administrative hearing, Mr. Clickner testified that he last worked as a mechanic. (Doc. 5-3, p. 50). Mr. Clickner was living with his wife and his eight-year-old son. (Doc. 5-3, pp. 56-57).

According to Mr. Clickner, he had an L4-L5 back fusion in October 2012, and he did not return to work after the surgery because of pain and his inability to handle daily functions. (Doc. 5-3, pp. 50-53, 61). Mr. Clickner testified that his employer fired him after learning that he (Mr. Clickner) needed back surgery. (Doc. 5-3, p. 51). Mr. Clickner stated that he received unemployment benefits after he lost his job. (Doc. 5-3, pp. 52-53).

According to Mr. Clickner, after his surgery, he experienced pain that travelled through his back, radiated into his leg, and caused muscle spasms. (Doc. 5-3, pp. 61-62). Mr. Clickner stated that when he walked too much, such as "[t]hirty minutes straight," he experienced muscle spasms. (Doc. 5-3, p. 62). Mr. Clickner testified that the spasms were "unbearable" and lasted from one or two hours to an entire night. (Doc. 5-3, pp. 62-63). Mr. Clickner stated that to relieve the spasms, he would lie down, but then his back would begin aching. (Doc. 5-3, pp. 63-64).

According to Mr. Clickner, when muscle spasms began, they would occur once, three times, or continuously daily. (Doc. 5-3, p. 64).

Mr. Clickner stated that he had a constant "sharp spot" in the "[l]ow, right" center of his back and periodic "sharp pains" going down the right side of his back and radiating to his leg. (Doc. 5-3, pp. 64-65). Mr. Clickner rated his pain five without muscle spasms and eight to nine with them. (Doc. 5-3, p. 65). Mr. Clickner testified that when he would experience muscle spasms, it felt like "somebody's literally stabbing you in the back." (Doc. 5-3, p. 65). Mr. Clickner stated that the stabbing pain occurred when he walked and sat and lasted from 30 to 45 minutes "to all day." (Doc. 5-3, p. 65). According to Mr. Clickner, he would reposition himself and use his hands to relieve the sharp pain. (Doc. 5-3, pp. 66-67).

Mr. Clickner testified that he had looked for jobs, but he could not walk and carry items "even up to five pounds" because his "back kills [him] doing it." (Doc. 5-3, pp. 53-54). Mr. Clickner stated that cold weather made his back pain worse. (Doc. 5-3, p. 55). Mr. Clickner testified that shifting from standing to sitting wore him out and that he had to lie down when the pain was very bad. (Doc. 5-3, p. 55). Mr. Clickner stated that bending caused sharp pain and "inflame[d] [his lower back pain] faster than anything else." (Doc. 5-3, pp. 67-68).

Mr. Clickner testified that a torn labrum in his left hip caused daily pain where his leg almost joins his hip. (Doc. 5-3, p. 68). Mr. Clickner described the pain as

"[e]xcruciating" after riding or driving for 20 minutes and otherwise as "a constant sharp pain." (Doc. 5-3, pp. 68, 69). Mr. Clickner estimated that he experienced hip pain two to three times weekly. (Doc. 5-3, p. 69). Mr. Clickner rated the pain at a level eight and stated that he would lie down to relieve it. (Doc. 5-3, pp. 69, 75). According to Mr. Clickner, he experienced pain in his right hip from a possible torn labrum but the pain on the right was not as intense as the pain on the left. (Doc. 5-3, p. 75). Mr. Clickner rated his right hip pain as a level six or seven. (Doc. 5-3, p. 75).

Mr. Clickner testified that he experienced hip pain primarily when sitting, but he also had problems walking on graded areas or light rocks because he favored his right hip to avoid irritating his left. (Doc. 5-3, p. 70). According to Mr. Clickner, bending at the hip or the knee caused sharp pain in his hip. (Doc. 5-3, p. 71). Mr. Clickner stated that he had taken medication and received injections to relieve hip pain, but he could no longer afford either without insurance coverage. (Doc. 5-3, pp. 70-71).

Mr. Clickner testified that he could not stand, sit, or walk "for longer than five to ten minutes . . . without taking [] breaks." (Doc. 5-3, pp. 51, 54-55). Mr. Clickner attributed his difficulty standing mainly to his back, with his hip "slowly com[ing] in and ma[king] [the pain] even worse." (Doc. 5-3, p. 70). Mr. Clickner stated that when he stood for an extended period, his back would begin to ache. (Doc. 5-3, p.

54).  Mr. Clickner stated that he could not put weight on his left leg for more than five to ten minutes daily.  (Doc. 5-3, p. 71).

Mr. Clickner testified that pain prevented him from walking on a graveled surface for more than ten minutes and a dirt surface for more than five minutes. (Doc. 5-3, pp. 71-72).  Mr. Clickner stated that he could walk 30 to 40 feet on level ground once or twice daily.  (Doc. 5-3, p. 73).  Mr. Clickner testified that he could not use public transportation because of back and hip pain.  (Doc. 5-3, p. 73).  Mr. Clickner stated that with a buggy to lean on, he could walk slowly in a grocery store for two aisles (or three to five minutes) without stopping.  (Doc. 5-3, pp. 73-74). According to Mr. Clickner, he used handrails to climb steps, and he could climb with a single handrail, but he would have to rest for five minutes because of pain.  (Doc. 5-3, pp. 74-75).  Mr. Clickner estimated that he could lift five pounds three to four times daily and carry that weight 30 to 40 feet on a smooth surface.  (Doc. 5-3, p. 79).

Mr. Clickner testified that after his back surgery, he cared for his son who was then three years old.  (Doc. 5-3, p. 57).  He prepared meals and drove his son from school weekly.  (Doc. 5-3, pp. 57-58).  According to Mr. Clickner, he had to stop picking his son up from school because of "back issues."  (Doc. 5-3, p. 58).  Mr. Clickner stated that he would go outside when he needed to watch his son.  (Doc. 5-3, p. 59).

Mr. Clickner stated he cleaned the house and did laundry with breaks, occasionally swept, and filled the dishwasher when his back permitted bending. (Doc. 5-3, pp. 55-56).  According to Mr. Clickner, he did not cook because standing caused pain.  (Doc. 5-3, p. 58).

To manage his pain, Mr. Clickner testified that he took aspirin and ibuprofen. (Doc. 5-3, p. 56).  According to Mr. Clickner, he could not afford prescription medication because he did not have health insurance, and his Medicaid coverage was under renewal.  (Doc. 5-3, p. 56).  Mr. Clickner also testified that his general physician, Dr. Calderwood, no longer could prescribe his medication, so Dr. Calderwood instructed Mr. Clickner to visit the pain clinic.  (Doc. 5-3, pp. 83-85). Mr. Clickner stated he had not sought treatment at the pain clinic because he could not afford the $200 charge.  (Doc. 5-3, p. 84).

Mr. Clickner testified that he watched TV five to six hours daily and spent time on the Internet one to two hours daily.  (Doc. 5-3, p. 59).  According to Mr. Clickner, to minimize pain during these periods, he would "constantly get up and down and move around."  (Doc. 5-3, p. 60).

Mr. Clickner testified that he hurt his back when helping a friend move a car transmission. Mr. Clickner estimated that the side of the transmission he lifted weighed 75 pounds.  According to Mr. Clickner, this lifting intensified his back pain, and he "shouldn't have done it."  (Doc. 5-3, pp. 76-77).

Mr. Clickner testified that he traveled to the beach in 2017, "rode in the back where [he] could stretch out," and stayed for one week. (Doc. 5-3, pp. 76, 81). Mr. Clickner stated that Dr. Calderwood gave him pain shots for the car ride. (Doc. 5-3, p. 77). Mr. Clickner explained that he had to stop "every 30 to 45 minutes to get out" of the car. (Doc. 5-3, pp. 77, 78). According to Mr. Clickner, when he went to the beach, he either sat in a chair or stood up and used the chair for leaning. (Doc. 5-3, p. 78).

3.     Medical Records

Mr. Clickner has a history of grade two spondylolisthesis and bilateral neuroforaminal narrowing. Dr. Gantt, a Tennessee Valley Pain Consultants physician, referred Mr. Clickner to Dr. Johnson, a neurosurgeon at the Spine & Neuro Center. (Doc. 5-9, pp. 5, 9; *see also* Doc. 5-9, p. 11) (August 2012 MRI with impressions of grade two spondylolisthesis with 13 mm of subluxation of L5 on S1, bilateral lumbar radiculopathy, and right L5-S1 facet cyst).[2] After the referral to Dr.

---

[2] "Spondylolysis, also known as a pars defect, happens when a crack forms in the bony ring on the back of the spinal column. Most commonly, this occurs in the lumbar spine. In this condition, the bone that protects the spinal canal fractures as a result of excessive or repeated stress." https://www.spinecenterbr.com/blog/pars-defect-condition-and-treatment (last visited Feb. 5, 2020).

"Neuroforaminal narrowing refers to a reduction of the size of the opening in the spinal column through which the spinal nerve exits. As this opening narrows, the nerve becomes compressed, which in turn can lead to pain that radiates along the path of the nerve." https://www.spine-health.com/glossary/neuroforaminal-narrowing (last visited Feb. 5, 2020).

Subluxation means a "[p]artial dislocation of a joint. A complete dislocation is a luxation." https://www.medicinenet.com/script/main/art.asp?articlekey=5581 (last visited Feb. 4, 2020).

Johnson, in October 2012, Mr. Clickner underwent an open reduction and internal fixation and an L4 to sacral fusion. (Doc. 5-9, p. 5; Doc. 5-18, pp. 62-67).[3]

During a surgical follow up appointment with Dr. Johnson in early November 2012, Mr. Clickner reported that his leg pain was "much better" and that his back pain had "improved." (Doc. 5-9, p. 6). Mr. Clickner stated that he was reducing his use of Nucynta and that he was "pleased with his progress." (Doc. 5-9, p. 6).[4] Dr. Johnson rated Mr. Clickner's muscle strength five out of five and stated that Mr. Clickner's x-rays "look[ed] good." (Doc. 5-9, p. 6). Dr. Johnson instructed Mr.

---

"Radiculopathy describes a range of symptoms produced by the pinching of a nerve root in the spinal column. The pinched nerve can occur at different areas along the spine (cervical, thoracic or lumbar). Symptoms of radiculopathy vary by location but frequently include pain, weakness, numbness and tingling." https://www.hopkinsmedicine.org/health/conditions-and-diseases/radiculopathy (last visited Feb. 4, 2020).

"A synovial cyst of the spine is a fluid-filled sac that develops along the spine. It's the result of degeneration of a facet joint of the vertebrae of the spine. Most synovial cysts develop in the portion of the lower spine called the lumbar spine. . . . and often don't produce symptoms." https://www.healthline.com/health/bone-health/synovial-cyst (last visited Feb. 4, 2020).

[3] "Open reduction internal fixation (ORIF) is a surgery to fix severely broken bones. . . . 'Open reduction' means a surgeon makes an incision to re-align the bone. 'Internal fixation' means the bones are held together with hardware like metal pins, plates, rods, or screws. After the bone heals, this hardware isn't removed." https://www.healthline.com/health/orif-surgery (last visited Feb. 4, 2020).

"Lumbar (lower back) sacral (tailbone) spinal fusion is a type of back surgery where the back bones are fused together so that they heal into a single, solid bone. Fusing the bones together minimizes movement between the bones and decreases stretching of nerves, surrounding ligaments and muscles." https://www.patientslikeme.com/treatment/lumbar-sacral-spinal-fusion (last visited Feb. 4, 2020).

[4] "Nucynta (tapentadol) is an opioid pain medication. . . . used to treat moderate to severe pain." https://www.drugs.com/nucynta.html (last visited Feb. 4, 2020).

Clickner to wear a brace for three months and to enroll in physical therapy twice weekly for six months.  (Doc. 5-9, p. 6).

During a visit to Dr. Gantt in late November 2012, Mr. Clickner rated his back pain at a level eight and described the pain as "aching and sharp."  (Doc. 5-13, p. 100).[5]  A registered nurse noted that Mr. Clickner walked independently and had a steady gait.  (Doc. 5-13, pp. 101, 102; Doc. 5-14, p. 2).  Mr. Clickner reported to the RN that he was walking for exercise seven times weekly.  (Doc. 5-13, p. 102).  Mr. Clickner stated that his leg pain "ha[d] improved" but not his back pain.  (Doc. 5-14, p. 2).  During this visit, a certified registered nurse practitioner noted:

> MEDS WORKING WELL W/O SIDE EFFECTS.  PLEASED W/ CURRENT PAIN CONTROL/ MED REGIMEN.
>
> RECOVERING WELL FROM RECENT SURGERY---LUMBAR FUSION W/ DR. JOHNSON.  RADICULAR PAIN HAS MOSTLY

---

[5] When he visited Dr. Gantt in August 2012, Mr. Clickner rated his pain nine out of ten.  (Doc. 5-13, pp. 54, 60).  Mr. Clickner described the pain as "worsening, constant, sharp, aching, and burning."  (Doc. 5-13, p. 54).  According to Mr. Clickner, "physical activity, standing, walking, and sitting" worsened his pain; "medication and rest" improved it.  (Doc. 5-13, p. 54).  Dr. Gantt noted that Mr. Clickner's gait was "steady," that Mr. Clickner was walking "independently," and that Mr. Clickner denied experiencing "difficulty walking."  (Doc. 5-13, pp. 55, 58).

During an appointment with Dr. Gantt in September 2012, Mr. Clickner again rated his pain at level nine. Dr. Gantt observed that Mr. Clickner's gait was "unsteady," "unstable," and "antalgic." (Doc. 5-13, pp. 61, 65). Consistent with these observations, Dr. Gantt determined that Mr. Clickner was a fall risk.  (Doc. 5-13, p. 62).

After receiving steroid injections in October 2012, Mr. Clickner rated his pain at level six and described it as "[a]ching [and] [s]tinging."  (Doc. 5-13, pp. 69-70; Doc. 5-13, p. 84).  Dr. Gantt observed that Mr. Clickner had a steady, but antalgic gait.  (Doc. 5-13, pp. 85, 89).  Dr. Gantt did classify Mr. Clickner as a fall risk.  (Doc. 5-13, p. 85).  During a later October 2012 visit, Mr. Clickner rated his pain nine after weaning medications down before surgery.  (Doc. 5-13, pp. 92, 95, 98).  Mr. Clickner's gait remained steady, but antalgic.  (Doc. 5-13, pp. 93, 97).

RESOLVED.  STILL HAVING A LOT OF BACK PAIN.  WEARING LSO BRACE.

(Doc. 5-14, p. 2).

Dr. Gantt examined Mr. Clickner in November 2012, observed that Mr. Clickner had an antalgic gait, and detected tenderness in Mr. Clickner's trunk.  (Doc. 5-14, pp. 3, 5).  Dr. Gantt reported that Mr. Clickner had normal strength and range of motion in all extremities.  (Doc. 5-14, p. 3).  Dr. Gantt did not adjust Mr. Clickner's pain management plan because Mr. Clickner stated he was "doing well," staying "functional without side effects," and "perform[ing activities of daily living] with much less difficulty."  (Doc. 5-14, p. 5) (capitalization omitted).  Mr. Clickner's medication list included Nucynta (one 100 mg tablet as needed every four hours for pain), oxycodone (one half to one 15 mg tablet as needed every eight hours for pain), Soma (one 350 mg tablet nightly for spasms), Robaxin (one 750 mg tablet as needed three times daily for spasms), Lyrica (one 75 mg capsule every eight hours), and Zipsor (one 25 mg capsule every six hours for pain).  (Doc. 5-14, p. 5).

Mr. Clickner returned to Tennessee Valley Pain Consultants in December 2012, January 2013, and February 2013.  (Doc. 5-14, pp. 6, 16, 28).  Mr. Clickner rated his pain at level eight in December and January and seven in February.  (Doc. 5-14, pp. 6, 16, 28).  During the January 2013 visit, Mr. Clickner received steroid injections.  (Doc. 5-14, pp. 14-15).  Mr. Clickner's gait was steady in December, (Doc. 5-14, p. 7) but antalgic with tenderness in his trunk, (Doc. 5-14, p. 10).  In

January 2013, Dr. Gantt noted that Mr. Clickner had a normal gait and range of motion. (Doc. 5-14, p. 21). Dr. Gantt reported that Mr. Clickner had an antalgic gait in February 2013 but walked independently. (Doc. 5-14, p. 32; Doc. 5-14, p. 29). Mr. Clickner requested no adjustments to his medication regimen. (Doc. 5-14, p. 33).

Six months after Mr. Clickner's onset date, Dr. Johnson wrote Dr. Gantt about Mr. Clickner's post-surgery visit. (Doc. 5-9, p. 5). According to the February 2013 letter, Mr. Clickner reported that he was "doing much better," taking less pain medication, and decreasing his use of Nucynta. (Doc. 5-9, p. 5). After reviewing spine films, Dr. Johnson saw "nice alignment of [Mr. Clickner's] construct[;] good position of the pedicle screws at L4, L5, and the sacrum[;] and good bone posterolaterally with a nice interbody spacer at L5-S1." (Doc. 5-9, p. 5). Dr. Johnson rated Mr. Clickner's muscle strength five out of five. (Doc. 5-9, p. 5). Dr. Johnson was "quite pleased with [Mr. Clickner's] progress" and instructed Mr. Clickner to return in one year. (Doc. 5-9, p. 5).

Mr. Clickner received treatment from Tennessee Valley Pain Consultants periodically. In April and July 2013, Mr. Clickner rated his pain eight and nine respectively and received steroid injections. (Doc. 5-14, pp. 35-36, 49-50). Mr. Clickner rated his pain seven in early August 2013. (Doc. 5-14, p. 63). Mr. Clickner complained chiefly of middle to lower back, bilateral hip, buttocks, and left thigh

pain. (Doc. 5-14, p. 65). Mr. Clickner reported fluctuating pain at level four on good days and at nine on bad days. (Doc. 5-14, p. 64). Mr. Clickner's gait was unsteady and antalgic, but he walked independently. (Doc. 5-14, pp. 65, 68). Mr. Clickner reported that his steroid injection in July 2013 did not decrease his low back pain and that he could "feel the rods" from his 2012 back surgery. (Doc. 5-14, p. 67) (internal quotation marks omitted). After examining Mr. Clickner in August 2013, Dr. Gantt described Mr. Clickner's thoracic facet joints as "very tender" and observed muscle spasms. (Doc. 5-14, p. 67). In late August 2013, Mr. Clickner received thoracic facet steroid injections. (Doc. 5-14, pp. 76, 79). Mr. Clickner rated his pain at level nine before the procedure and seven upon discharge. (Doc. 5-14, pp. 80, 90). Mr. Clickner's gait was steady. (Doc. 5-14, p. 82).

When Mr. Clickner returned to Tennessee Valley Pain Consultants in early September 2013, he complained chiefly of middle and lower back and hip pain. (Doc. 5-14, p. 93). He rated his pain at level eight. (Doc. 5-14, p. 93). During this visit, Mr. Clickner told a licensed practical nurse that his August injections had not helped and that he was "in more pain now than ever." (Doc. 5-15, p. 2). Mr. Clickner's gait was steady but antalgic. (Doc. 5-14, p. 94; Doc. 5-15, p. 5). Mr. Clickner walked independently. (Doc. 5-14, p. 94). Dr. Gantt did not adjust Mr. Clickner's medication regimen. (Doc. 5-15, p. 6).

Mr. Clickner received steroid injections in late September 2013. (Doc. 5-15, p. 8). Mr. Clickner complained of back, hip, left leg, and heel pain. (Doc. 5-15, p. 9). Mr. Clickner rated his pain as an eight or nine before the procedure and five upon discharge. (Doc. 5-15, pp. 9, 21). Mr. Clickner had a steady gait and walked independently. (Doc. 5-15, pp. 10, 11).

During Mr. Clickner's November 2013 visit, he complained of "throbbing [and] aching" back pain and rated it eight. (Doc. 5-15, p. 23). Mr. Clickner had a steady but antalgic gait. (Doc. 5-15, pp. 24, 28). Mr. Clickner walked without assistance and denied walking difficulties. (Doc. 5-15, pp. 24, 27). Mr. Clickner received instructions to follow "medical management" and "[s]chedule injections as needed." (Doc. 5-15, p. 29). Mr. Clickner's self-reporting and medical findings during December 2013 were consistent with those from November 2013. (*Compare* Doc. 5-15, pp. 30-37, *with* Doc. 5-15, pp. 23-29).

Mr. Clickner returned to Tennessee Valley Pain Consultants in January 2014 for steroid injections. (Doc. 5-15, pp. 39-41). Mr. Clickner complained of back, leg, and knee pain. (Doc. 5-15, p. 41). Mr. Clickner rated his pain eight or nine before the procedure and six upon discharge. (Doc. 5-15, pp. 41, 51-52). Mr. Clickner's gait was steady, and he walked independently. (Doc. 5-15, p. 42).

Mr. Clickner received steroid injections and complained of right shoulder blade pain in February 2014. (Doc. 5-15, pp. 54-55, 56). Mr. Clickner rated his pain

at level seven or eight before the procedure and eight afterwards.  (Doc. 5-15, pp. 56, 66).  According to the February 2014 treatment record, Mr. Clickner walked independently and steadily.  (Doc. 5-15, p. 56).

When he returned to Tennessee Valley Pain Consultants in April 2014, Mr. Clickner complained of back, leg, and left foot pain and received steroid injections. (Doc. 5-15, p. 70; Doc. 5-15, p. 69). Mr. Clickner walked independently and steadily. (Doc. 5-15, p. 71).  Mr. Clickner rated his pain nine before the procedure.  (Doc. 5-15, p. 70).  The treatment record does not show Mr. Clickner's pain rating after the procedure.  (Doc. 5-15, p. 81).

During Mr. Clickner's May 2014 injection visit, he complained of back and leg pain.  (Doc. 5-15, pp. 84-86).  Mr. Clickner walked independently and steadily. (Doc. 5-15, p. 87).  Mr. Clickner's pain ratings before the procedure were nine and eight; afterwards, the were six.  (Doc. 5-15, p. 86; Doc. 5-16, p. 2).

Mr. Clickner complained of back and leg pain and rated it at level nine at Tennessee Valley Pain Consultants in late May 2014.  (Doc. 5-16, pp. 6, 7).  Mr. Clickner walked steadily and independently, but his gait was antalgic.  (Doc. 5-16, pp. 7, 8, 11).  A licensed practical nurse noted that Mr. Clickner wanted to discuss changing medication.  (Doc. 5-16, p. 9).  According to Mr. Clickner, the early May 2014 procedure had helped the right side of his back but not the left.  (Doc. 5-16, p. 9).  A certified registered nurse practitioner discussed streamlining Mr. Clickner's

medication regimen because he was taking too many medications with a short-term relief focus. (Doc. 5-16, p. 9). Dr. Gantt instructed Mr. Clickner to stop taking Nucynta, start using oxymorphone (one 30 mg tablet every 12 hours), and continue oxycodone (one 15 mg tablet every four to six hours for breakthrough pain) and other prescribed medication. (Doc. 5-16, pp. 9, 12).

When Mr. Clickner returned to Tennessee Valley Pain Consultants in June 2014, he rated his back pain nine and characterized it as severe. (Doc. 5-16, pp. 15, 17). Mr. Clickner described the pain as "[a]ching [and] [b]urning" and reported numbness. (Doc. 5-16, p. 15). Mr. Clickner walked steadily and independently, but his gait was antalgic. (Doc. 5-16, pp. 15, 16, 19). Mr. Clickner stated that his medication was not "helping his pain at all," and he requested an MRI. (Doc. 5-16, p. 17). Dr. Gantt instructed Mr. Clickner to discontinue oxymorphone, start OxyContin (one 30 mg tablet every eight hours), and continue other prescribed medication. (Doc. 5-16, p. 17).

Mr. Clickner received steroid injections and complained of back and right leg pain in July 2014. (Doc. 5-16, pp. 23-24). Mr. Clickner walked independently and steadily. (Doc. 5-15, p. 26).

Mr. Clickner's July 2014 spine MRI results revealed normal alignment and no significant abnormalities in his vertebrae and cord. (Doc. 5-16, p. 38). The radiologist noted that Mr. Clickner had a "fairly severe disc space narrowing with

[a] mild bulge of the annulus" at L5-S1. (Doc. 5-16, p. 38). The radiologist's impressions included no significant abnormalities associated with Mr. Clickner's 2012 back surgery and mild degenerative changes without "significant canal or neuroforaminal compromise." (Doc. 5-16, p. 38).

During Mr. Clickner's return visit to Tennessee Valley Pain Consultants in July 2014, he complained of "throbbing [and] sharp" back pain, "shocking" right leg pain, "intermittent numbness," "tingling," and "burning." (Doc. 5-16, pp. 39, 40). Mr. Clickner rated his pain at level eight or nine. (Doc. 5-16, pp. 39, 40). Mr. Clickner reported that activity worsened his pain; rest, medication, and procedures alleviated it. (Doc. 5-16, p. 40). Mr. Clickner's gait was unsteady and antalgic, and he was limping significantly. (Doc. 5-16, pp. 40, 44). Dr. Gantt noted that Mr. Clickner was in "mild distress." (Doc. 5-16, p. 44). Dr. Gantt instructed Mr. Clickner to take OxyContin, oxycodone, and Lyrica. (Doc. 5-16, p. 46).

Mr. Clickner received steroid injections in early August 2014. (Doc. 5-16, pp. 49-50). Mr. Clickner's description of his back and leg pain was similar to July 2014. (Doc. 5-16, pp. 51, 52). Dr. Gantt observed that Mr. Clickner had a normal gait. (Doc. 5-16, p. 58).

When he returned to Tennessee Valley Pain Consultants later in August 2014, Mr. Clickner complained of back and right lower extremity pain. (Doc. 5-16, p. 65). Mr. Clickner rated the pain at an eight. (Doc. 5-16, p. 65). Mr. Clickner walked

steadily and independently according to a licensed practical nurse. (Doc. 5-16, pp. 66, 67, 68). This note conflicts with another observation from a certified registered nurse practitioner that Mr. Clickner's gait was antalgic and that he limped significantly when walking. (Doc. 5-16, pp. 69, 70, 73). Mr. Clickner reported that the August injections had "helped his pain." (Doc. 5-16, p. 68).

Mr. Clickner returned to Tennessee Valley Pain Consultants in September 2014 for steroid injections. (Doc. 5-16, pp. 74, 75). Mr. Clickner complained of back and right lower extremity pain and rated it at level seven. (Doc. 5-16, p. 75). Mr. Clickner walked steadily and independently. (Doc. 5-16, p. 76). Dr. Gantt observed that Mr. Clickner had a normal gait. (Doc. 5-16, p. 81).

After filing his disability application later in September 2014, Mr. Clickner visited Tennessee Valley Pain Consultants and complained of back and lower right extremity pain. (Doc. 5-16, p. 87). Mr. Clickner rated his pain at level seven. (Doc. 5-16, pp. 87, 88). Mr. Clickner walked steadily and independently. (Doc. 5-16, p. 88). This note conflicts with another observation from a certified registered nurse practitioner that Mr. Clickner's gait was antalgic and that he limped significantly. (Doc. 5-16, pp. 92, 93). Mr. Clickner reported "good relief" from the injection procedure. (Doc. 5-16, p. 90). Dr. Gantt prescribed Zanaflex (one 4 mg capsule nightly) for spasms and sleep and discontinued Mr. Clickner's prescription for Soma. (Doc. 5-16, p. 94).

Mr. Clickner returned to Tennessee Valley Pain Consultants in November 2014 and complained of "aching and sharp" back pain. (Doc. 5-16, p. 95). Mr. Clickner rated his pain at level seven. (Doc. 5-16, p. 95). Treatment notes show conflicting reports about Mr. Clickner's gait and ability to walk. (*Compare* Doc. 5-16, p. 96 (reporting steady and independent gait), *with* Doc. 5-17, p. 3 (noting "antalgic, significant limp")). Mr. Clickner reported stretching three times weekly for exercise. (Doc. 5-16, p. 97).

Mr. Clickner had an injection procedure in December 2014 and complained of back and right buttock pain. (Doc. 5-17, p. 10). Mr. Clickner rated his pain at level eight during intake. (Doc. 5-17, p. 10). Mr. Clickner walked steadily and independently. (Doc 5-17, p. 11). Dr. Gantt observed that Mr. Clickner had a normal gait. (Doc. 5-17, p. 17).

Mr. Clickner returned to Tennessee Valley Pain Consultants in January 2015 and complained of back and right buttock pain. (Doc. 5-17, p. 23). Mr. Clickner rated his pain at level eight. (Doc. 5-17, p. 23). The observations of Mr. Clickner's gait from this visit inconsistently reflect a steady and independent gait on the one hand and an antalgic gait with a significant limp on the other. (Doc 5-17, pp. 24, 28).[6] Mr. Clickner reported "30-40% relief" from the December 2014 procedure

---

[6] The TVPC providers' inconsistent descriptions of Mr. Clickner's gait could be due to copying notes from a prior visit on a subsequent record.

that was "still lasting." (Doc. 5-17, pp. 26, 27). Mr. Clickner requested no adjustments to his medication regimen. (Doc. 5-17, p. 27).

In March 2015, Mr. Clickner had an injection procedure. (Doc. 5-17, pp. 32-33). Mr. Clickner complained of facet or joint pain and rated the pain at level seven. (Doc. 5-17, p. 34). A registered nurse noted that Mr. Clickner walked steadily and independently. (Doc. 5-17, p. 35). Dr. Gantt observed that Mr. Clickner had a normal gait. (Doc. 5-17, p. 40). Mr. Clickner rated his pain nine before the procedure and at eight afterwards. (Doc. 5-17, p. 40). The record does not show that Mr. Clickner returned to Tennessee Valley Pain Consultants after the March 2015 visit.

Mr. Clickner had an injection procedure at Huntsville Hospital in January 2016. (Doc. 5-18, p. 17).

In February 2016, Mr. Clickner visited Dr. Calderwood, his family doctor, and complained of back and ankle pain. (Doc. 5-17, p. 75, 76). Mr. Clickner reported that the sacral and epidural block that he had received "seemed to make things worse" and that after the procedure he remained in bed for two days. (Doc. 5-17, p. 76). Mr. Clickner reported having sudden ankle pain but stated that walking and using his ankle did not hurt. (Doc. 5-17, p. 76). Mr. Clickner denied swelling, range of motion issues, joint pain weakness, muscle atrophy, and night cramps. (Doc. 5-17, p. 76). After examining Mr. Clickner, Dr. Calderwood noted that he

(Mr. Clickner) was in "no apparent distress" but was sitting in a tilted position "to the right" and that he could not tilt to the left. (Doc. 5-17, p. 77). Dr. Calderwood found tenderness in Mr. Clickner's "left SI joint area and buttock." (Doc. 5-17, p. 77). The results of Mr. Clickner's straight leg raising test were negative. (Doc. 5-17, p. 77).[7] Mr. Clickner's medication list included OxyContin (one 30 mg tablet three times daily), Roxicodone (one 15 mg tablet four times daily), Zanaflex (one 4 mg capsule twice daily), and Lyrica. (Doc. 5-17, p. 77).[8]

During his visit to Dr. Calderwood in March 2016, Mr. Clickner complained of low back pain. (Doc. 5-17, p. 73). Mr. Clickner reported that his left leg pain had subsided. (Doc. 5-17, p. 73). Mr. Clickner stated that he could not get nerve blocks because of a change in insurance. (Doc. 5-17, p. 74). Mr. Clickner requested "a refill of his pain medication" and asked if Dr. Calderwood could prescribe a medication less expensive than OxyContin. (Doc. 5-17, p. 74). Dr. Calderwood prescribed MS Contin (one 30 mg tablet three times daily) in lieu of OxyContin and

---

[7] Examiners use the straight leg raise test to evaluate patients "with low back pain and nerve pain that radiates down the leg." https://www.ebmconsult.com/articles/straight-leg-raising-test (last visited Feb. 12, 2020).

[8] "OxyContin and immediate-release oxycodone belong to a drug class called opioids." https://www.healthline.com/health/pain-relief/oxycodone-vs-oxycontin (last visited Feb. 18, 2020).

Roxicodone is a brand name for oxycodone. "This medication is used to help relieve moderate to severe pain. . . . [and] belongs to a class of drugs known as opioid (narcotic) analgesics." https://www.webmd.com/drugs/2/drug-3499/roxicodone-oral/details (last visited Feb. 18, 2020).

instructed Mr. Clickner to schedule a neurosurgery appointment "as soon as insurance allows." (Doc. 5-17, p. 75).[9]

Mr. Clickner returned to Dr. Calderwood in May 2016 and complained of low back and left leg pain. (Doc. 5-17, pp. 71, 72). Mr. Clickner reported that the injections he had received had not helped much and that he had a nerve impingement. (Doc. 5-17, p. 71). Mr. Clickner stated that surgery was not an option. (Doc. 5-17, p. 71). Mr. Clickner reported that his wife was working part time and that they had no insurance and little money. (Doc. 5-17, p. 71). Mr. Clickner stated that "he would like to return to work" as a mechanic but that bending over a car caused severe pain. (Doc. 5-17, p. 71). Mr. Clickner denied swelling, range of motion issues, joint pain weakness, muscle atrophy, and night cramps. (Doc. 5-17, p. 72). After examining Mr. Clickner, Dr. Calderwood reported a decreased range of motion in Mr. Clickner's back and "tenderness in the health 4 5 S1 paraspinous musculature on both sides especially on the left." (Doc. 5-17, p. 73). The results of Mr. Clickner's straight leg raising test were negative. (Doc. 5-17, p. 73). Dr. Calderwood noted that vocational rehabilitation might be an option for Mr. Clickner. (Doc. 5-17, p. 73).

---

[9] "MS Contin (morphine) is an opioid medication. . . . used to treat moderate to severe pain." https://www.drugs.com/ms_contin.html (last visited Feb. 18, 2020).

Mr. Clickner visited Dr. Calderwood in August 2016 and complained of back pain. (Doc. 5-17, pp. 69, 70). Mr. Clickner reported having a pain clinic appointment scheduled in October 2016. (Doc. 5-17, p. 69). Dr. Calderwood noted that the pain clinic could manage Mr. Clickner's back pain. (Doc. 5-17, p. 69). Mr. Clickner denied swelling, range of motion issues, joint pain weakness, muscle atrophy, and night cramps. (Doc. 5-17, p. 70). After examining Mr. Clickner, Dr. Calderwood noted a decreased range of and discomfort with motion. (Doc. 5-17, p. 71). The results of Mr. Clickner's straight leg raising test were negative. (Doc. 5-17, p. 71). Mr. Clickner's medication included MS Contin, Roxicodone, and Zanaflex. (Doc. 5-17, p. 71). Dr. Calderwood instructed Mr. Clickner to follow up with "the Medicaid physician as scheduled." (Doc. 5-17, p. 71).

In September 2016, Mr. Clickner visited HH Physician Care Hampton Cove as a new patient and met with Dr. Allada, a general physician. (Doc. 5-19, p. 6). Mr. Clickner reported that he had gotten Medicaid coverage and wanted to establish a relationship "with a pain clinic for chronic back pain." (Doc. 5-19, p. 6). According to Mr. Clickner, "he was born with a spine deformity that started pinching on the nerves as he grew up." (Doc. 5-19, p. 6). Mr. Clickner stated that had been dealing with chronic back and radiating leg pain for more than ten years. (Doc. 5-19, p. 6). Mr. Clickner rated his pain at level seven. (Doc. 5-19, p. 9).

Dr. Allada observed that Mr. Clickner was not in "acute distress" and had a "normal gait and coordination." (Doc. 5-19, p. 6). Dr. Allada noted no mobility limitations or range of motion abnormalities for Mr. Clickner. (Doc. 5-19, p. 10). Mr. Clickner complained of joint and back pain, stiffness, and muscle aches. (Doc. 5-19, p. 7). Mr. Clickner denied "muscle cramps, joint swelling, . . . joint fluid, muscle weakness, arthritis, gout and loss of strength." (Doc. 5-19, p. 7). Mr. Clickner's medications included oxycodone (one 15 mg tablet four times daily), morphine sulfate (one 50 mg tablet three times daily), Zanaflex (one 4 mg capsule three times daily), amitriptyline (one 25 mg tablet nightly) for sleep, and Lyrica (one 75 mg capsule three times daily). (Doc. 5-19, pp. 9, 10). Dr. Allada instructed Mr. Clickner to return in six months. (Doc. 5-19, p. 9).

Based on Dr. Calderwood's referral, Mr. Clickner saw Dr. Johnson in October 2016, who was practicing at SportsMed Orthopaedic Surgery & Spine Center. (Doc. 5-19, pp. 18, 20). Dr. Johnson wrote that Mr. Clickner had full strength in his lower extremities, but he observed an "antalgic forward-flexed gait." (Doc. 5-19, p. 20). Dr. Johnson noted that Mr. Clickner had "some pain with internal and external rotation of his right hip." (Doc. 5-19, p. 20). Based on Mr. Clickner's "intractable complaints," Dr. Johnson recommended MRIs of Mr. Clickner's spine and right hip. (Doc. 5-19, p. 20).

During a November 2016 visit, Dr. Calderwood noted that Mr. Clickner had seen Dr. Johnson and that Dr. Johnson had ordered an MRI. (Doc. 5-17, p. 67). Dr. Calderwood reported that if the MRI showed something negative, then Mr. Clickner would receive a pain clinic referral. (Doc. 5-17, p. 67). Mr. Clickner requested medications refills from Dr. Calderwood in the meantime. (Doc. 5-17, p. 67). Dr. Calderwood noted that he did not examine Mr. Clickner's back but reported a "marked decrease range of motion with tenderness in the lower lumbar spine." (Doc. 5-17, p. 69). Mr. Clickner's straight leg raise test results were negative. (Doc. 5-17, p. 69). Dr. Calderwood instructed Mr. Clickner to continue medication regimen and follow up with Dr. Johnson. (Doc. 5-17, p. 69).

Dr. Johnson noted later in November 2016 that he had reviewed Mr. Clickner's MRIs. (Doc. 5-18, p. 5; Doc. 5-18, pp. 19-20, 21). In the November 2016 addendum, Dr. Johnson reported:

> [Mr. Clickner's] MRI of the lumbar spine shows postoperative changes but I really do not appreciate anything that I think would benefit from further surgical interventions in his back.
>
> The MRI of [Mr. Clickner's] right hip did show a question of a subtle tear in the superior labrum but I do not know that that is enough to be clinically significant.
>
> I have set [Mr. Clickner] up to see Dr. Eric Janssen to see if he thinks this is clinically relevant. I think the only option from the back standpoint would be to remove his hardware but Mr. Clickner states that is not something he wishes to consider. At this point, I will be available as needed.

(Doc. 5-18, p. 5).

Mr. Clickner visited Dr. Franklin of SportsMed in early December 2016 based on an internal referral from Dr. Johnson for an examination of Mr. Clickner's "possible lateral tear." (Doc. 5-18, pp. 12, 14). Dr. Franklin noted that Mr. Clickner "stands and ambulates with [an] antalgic gait." (Doc. 5-18, p. 13). According to Dr. Franklin, most of Mr. Clickner's right hip pain was related to his spine. (Doc. 5-18, p. 14). Dr. Franklin recommended "an intra-articular injection MRI arthrogram of [Mr. Clickner's] right hip" and hip exercises. (Doc. 5-18, p. 14). Mr. Clickner agreed to the procedure and tolerated it well. (Doc. 5-18, p. 16).

Mr. Clickner returned to Dr. Allada in early December 2016. (Doc. 5-19, pp. 23, 29). Mr. Clickner requested a refill of his Lyrica prescription. (Doc. 5-19, p. 23). Dr. Allada reported that Mr. Clickner walked independently and had no mobility or range of motion limitations. (Doc. 5-19, p. 27).

Less than one week later, Mr. Clickner visited Dr. Allada and complained of "severe" and "sharp" back pain from a car accident. (Doc. 5-19, p. 31). Mr. Clickner denied lower extremity weakness and numbness. (Doc. 5-19, p. 31). Mr. Clickner reported getting narcotic prescriptions from Dr. Calderwood. (Doc. 5-19, p. 31). During this later December 2016 visit, Dr. Allada noted that Mr. Clickner walked independently and had no mobility or range of motion limitations. (Doc. 5-19, p. 34).

Based on SportsMed's recommendation, Mr. Clickner had an MRI of his left hip in February 2017. (Doc. 5-18, p. 18). The radiologist reported no significant abnormalities expect for a torn labrum. (Doc. 5-18, p. 18).

Mr. Clickner saw Dr. Calderwood several times in 2017. (Doc. 5-17, pp. 58-67). During the January 2017 visit, Mr. Clickner reported that he had an arthrogram of his right hip scheduled with Dr. Franklin. (Doc. 5-17, p. 65). Mr. Clickner stated that he had injured his back in a recent car accident. (Doc. 5-17, p. 65). Mr. Clickner received back and hip pain medication. (Doc. 5-17, pp. 65, 67). Dr. Calderwood instructed Mr. Clickner to follow up with the orthopedist. (Doc. 5-17, p. 67).

During the March 2017 visit with Dr. Calderwood, Mr. Clickner requested a refill of his back and hip medication because his family was "going on a beach trip." (Doc. 5-17, p. 62). Mr. Clickner reported to Dr. Calderwood that he had "aggravated his back working on a transmission." (Doc. 5-17, p. 62).

In May 2017, Mr. Clickner returned to Dr. Allada and complained of dizziness. (Doc. 5-19, p. 36). Dr. Allada noted that Mr. Clickner was not in "acute distress." (Doc. 5-19, p. 36). Mr. Clickner denied "poor balance, . . . disturbances in coordination, numbness, . . . falling down, tingling, . . . weakness, [and] tremors . . . ." (Doc. 5-19, p. 37). Dr. Allada noted that Mr. Clickner walked independently and had no mobility or range of motion limitations. (Doc. 5-19, p. 39).

Mr. Clickner returned to Dr. Calderwood in May 2017 and complained of back and right hip pain. (Doc. 5-17, pp. 60, 62). Dr. Calderwood noted that Mr. Clickner was supposed to find a clinic to manage his pain. (Doc. 5-17, p. 60). Dr. Calderwood wanted Mr. Clickner to do a drug screen but noted that Medicaid would not cover the expense and that Mr. Clickner could not afford to pay out of pocket. (Doc. 5-17, p. 62). Dr. Calderwood agreed to fill MS Contin and Roxicodone for one month. (Doc. 5-17, p. 62). Dr. Calderwood told Mr. Clickner that he (Mr. Clickner) would need to locate a pain clinic or Medicaid doctor for future prescriptions. (Doc. 5-17, p. 62).

Mr. Clickner visited Dr. Calderwood in June 2017 and requested pain medication refills. (Doc. 5-17, p. 58). Dr. Calderwood restated the instructions from Mr. Clickner's May 2017 visit. (Doc. 5-17, p. 58). Mr. Clickner reported that he had lost Medicaid coverage and pled "for one more month's prescription" while he tried to reestablish coverage and locate a Medicaid doctor. (Doc. 5-17, p. 58). Mr. Clickner received one-month refills on MS Contin and Roxicodone. Dr. Calderwood instructed Mr. Clickner to follow up with a Medicare physician. (Doc. 5-17, p. 58).

4.     The ALJ's Assessment of Mr. Clickner's Records

The ALJ discounted Mr. Clickner's complaints of back and hip pain. The ALJ stated:

[Mr. Clickner's] statements about the intensity, persistence and limiting effects of his symptoms [were] not persuasive as the records consistently show [Mr. Clickner] is not in distress; he admits that medication helps him to perform daily activities easier and makes him more functional with no side effects from this medication. [Mr. Clickner's] degenerative disc disease does not result in greater limitations than set out above. He has been treated conservatively for back pain with ongoing refills of opiate medication until recently when he pleaded for another month's supply from his physician and he is now on non-opiate medications of ibuprofen he purchases over the counter. [Mr. Clickner] testified that he no longer takes prescription medication for degenerative disc disease and only takes over-the-counter aspirin and ibuprofen. This is despite receiving Medicaid insurance (Exhibit 10F, pg. 5). Range of motion and strength in the bilateral lower extremities has been consistently normal and no significant stenosis has been identified. He is consistently noted to be alert and oriented to time, place and person; he has a steady gait.

(Doc. 5-3, p. 18).

5.    Analysis

The ALJ overlooked some of the medical records that relate to Mr. Clickner's pain and ability to walk. As the Court's summary indicates, Mr. Clickner's medical records confirm a longstanding history of back pain before and during the disability period. Mr. Clickner's doctors have prescribed a variety of medications for back pain, including narcotics, and Mr. Clickner received steroid injections to manage his back pain. Numerous treatment notes from Tennessee Valley Pain Consultants and other providers reflect that Mr. Clickner has had an intermittent antalgic gait. And more than once in 2014, providers observed that Mr. Clickner's gait was unsteady

or that he was limping. These parts of Mr. Clickner's medical history are consistent with his pain testimony.

Other parts of his medical history are not. The bulk of Mr. Clickner's treatment notes confirm that he walked with a steady gait, had full range of motion and strength in his lower extremities, and walked independently. Mr. Clickner did not complain to his providers that his pain prevented him from walking, standing, or sitting, and Mr. Clickner did not request an ambulatory device. Mr. Clickner reported periodically exercising multiple times weekly. (Doc. 5-13, p. 102; Doc. 5-16, pp. 89, 97). These records undermine Mr. Clickner's testimony that pain significantly limits his ability to sit, stand, and walk.

Mr. Clickner requested medication adjustments occasionally and reported that he was pleased with his medication regimen, including the positive impact of injections. (Doc. 5-14, pp. 2, 20, 30, 33; Doc. 5-16, p. 90). For example, in February 2013, Mr. Clickner reported that his functionality had increased under his medication plan and that he was able to perform daily activities more easily. (Doc. 5-15, p. 33). Mr. Clickner's working on and lifting a car transmission, travelling to the beach with his family, and treating pain with ibuprofen and aspirin during the disability period bolster the ALJ's decision to discount Mr. Clickner's subjective testimony about his disabling symptoms. (Doc. 5-17, p. 62; Doc. 5-3, p. 56).

There is objective medical evidence that corroborates Mr. Clickner's pain testimony, but substantial evidence supports the ALJ's decision to partially discredit Mr. Clickner's testimony concerning the limitations that he attributes to pain. *See Markuske v. Comm'r of Soc. Sec.*, 572 Fed. Appx. 762, 766 (11th Cir. 2014) (A claimant's self-reporting that medication has reduced pain symptoms supports an adverse credibility finding.); *Markuske*, 572 Fed. Appx. at 767 ("The objective medical evidence cited by the ALJ provided 'adequate reasons' for her decision to partially discredit Markuske's subjective complaints [of back, neck, elbow, and carpal tunnel syndrome pain]."). The ALJ did not ignore Mr. Clickner's complaints of pain; the ALJ weighed that information in arriving at Mr. Clickner's RFC. Thus, substantial evidence supports the ALJ's treatment of Mr. Clickner's pain testimony.

B.     Mr. Clickner's Left Hip Evidence

According to Mr. Clickner, the ALJ should have classified his (Mr. Clickner's) torn left labrum, detected in the February 2017 MRI, as a severe impairment and determined that Mr. Clickner meets the requirements of 20 C.F.R. § 404.00, Subpart P, Appendix 1, Listing 1.02(A).  (Doc. 9, p. 5).

As noted, Mr. Clickner received an injection at his right hip for a torn labrum. (Doc. 5-18, p. 14).  The Court did not find a record that indicates that Mr. Clickner underwent a similar procedure on his left hip.  But even if the ALJ incorrectly treated Mr. Clickner's left torn labrum as a non-severe impairment, the error is harmless

because the ALJ continued with the sequential disability framework and did not end his analysis at step three.

After evaluating the medical evidence, the ALJ determined that Mr. Clickner's impairments do not meet listing 1.02 or 1.04. (Doc. 5-3, pp. 13-14). Concerning listing 1.02, the ALJ found that the record lacked evidence that Mr. Clickner could not walk effectively. Listing 1.02 provides:

> Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;

20 C.F.R. § 404.00, Subpart P, Appendix 1, Listing 1.02(A).

The regulations address effective ambulation as follows:

> (1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)

> (2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. § 404.00, Subpart P, Appendix 1, 1.00B2b.

To meet a listing, a claimant has the burden of producing medical evidence to support all the requirements of the listed category. *Bowen v. Yuckert*, 482 U.S. 137, 146 & n.5 (1987). To medically equal a listing, a claimant must produce medical evidence "describ[ing] how the impairment has such a medical equivalency." *Bell v. Bowen*, 796 F.2d 1350, 1353 (11th Cir. 1986). Because Mr. Clickner relies on his hearing testimony to show his inability to walk effectively, he does not meet listing 1.02(A). Mr. Clickner's physicians' observations in the medical record that he experienced difficulty walking occasionally and an unsteady or antalgic gait periodically do not medically establish that Mr. Clickner could not ambulate effectively for 12 months.

## V. CONCLUSION

As stated above, this Court may not substitute its judgment for the judgment of the ALJ. Because substantial evidence supports the ALJ's analysis, the Court affirms the Commissioner's decision.

**DONE** this 24th day of February, 2020.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE